OF AND DURING THE FIXING, AND ALSO BASED ON COMMUNICATIONS FROM U.S. BEST TRADERS TO THE FIXING PARTICIPANTS IN LONDON. PLAINTIFFS ARE DIRECT VICTIMS OF THIS PRICE FIXING CONSPIRACY BECAUSE THEY SOLD NYMEX PLATINUM AND PALLADIUM FUTURES, OR THEY SOLD PHYSICAL PLATINUM AND PALLADIUM OF PURITY OF 99.95%. PLAINTIFFS ARE THE PEOPLE THE ANTITRUST LAWS WERE INTENDED TO PROTECT, AND DEFENDANTS' CONDUCT IS OF THE TYPE THE ANTITRUST LAWS WERE MEANT TO PROTECT. NYMEX PLAINTIFFS ARE EFFICIENT ENFORCERS BECAUSE THEY SOLD FUTURES CONTRACTS THAT HAVE AS THEIR UNDERLYING THE PHYSICAL COMMODITY THE FIXING PRICE SETS. WE PLEADED THAT THERE IS A NEAR 1 TO 1 RELATIONSHIP BETWEEN THE FIXING, THE PHYSICAL PRICES, AND THE NYMEX FUTURES PRICES, AND THE STATISTICAL ANALYSES IN OUR COMPLAINT SHOW THAT TYPE RELATIONSHIP, AND THAT'S IN THE CHARTS 5 THROUGH 9, AND THE RECORD SITE IS 388 91. Counsel, I just want to ask an overall question. It strikes me as, let me put it this way, bizarre that the people who make the fixing can also do the trading. How did that happen? What kind of deal is this? Well, Your Honor, that's exactly the point. The ability to control the fixing itself gave them prime opportunity to benefit from the ability to manipulate it. But this is a system that's in place that everyone acknowledges. That's the system. How could that be? Well, that's, I believe, for the defendants to explain on why they decided to structure the fixing the way it was. Actually, you say in your complaint that the fix would not be tolerated in other industries. So I guess Judge Pooler is just asking, well, why was it tolerated in this one? Exactly. Thank you. Exactly what I was asking. Isn't it tolerated in many industries trading in metals and in other things? There are other fixings in other precious metals, but the fix, and those cases, there are also cases relating to them. The idea, you know, they have set up this system, the defendants set up this system in a way to create a benchmark. But in doing so, they've also rigged the game, what we allege, they rigged the game in their that ability and the exclusive control that they had on the fixing. Why they did not decide to develop it in a system that is more less prone to manipulation or less prone to the incentives for particular participants to actually fix it is, you know, we can't opine why they did what they did, but we are claiming and alleging that what they did was unlawful. And your position, as you said a moment ago, is that everyone who was selling on the exchange is an efficient enforcer of the antitrust laws, right? Correct. That they are based on the relation, the interrelationship between the futures price and the fixing price. And there is that relationship because the underlying commodity is the grade of platinum and palladium. That is. It's going to be the case that even though the defendants are only responsible for a small number of exchange transactions, they're going to be liable with treble, they could be liable with treble damages for all transactions. Is that right? You think that's a problem? No, actually, I don't think that is. And it's not clear to me that it is actually even a small percentage of the overall trading market. But in any event, the idea behind the antitrust laws was never really to have proportionality in mind. The whole notion of treble damages, as you noted, is actually, militates against the notions of proportionality because it was designed to compensate victims and punish and deter future behavior, illegal behavior. It's not measured by stripping away the unlawful gains that they did. And that's what this court recognized as crimpers. But in the case of the NYMEX plaintiffs who did not deal directly with the defendants, correct? Correct. Aren't there intervening factors or events that break, in effect, the chain of causation? We don't believe there are, given the tight linkage between the two markets. The markets are supposed to operate efficiently. And when you manipulate or you engage in unlawful conduct in one market, it will necessarily translate over to the related futures market because they have to align together in order to have the futures market be anything of value for people who deal in the metals. So what about this issue that the district court was concerned with, that not everybody needs to adopt the benchmark, that they have a choice to adopt the fix and to write it into their contracts? Does that break the chain of causation? Well, no. Definitely not for the NYMEX because the NYMEX doesn't actually – you have a standardized contract here. There's no actual ability to negotiate different terms. So in that respect, the NYMEX is actually a better position, is actually a very superior position here because they are bound by the operation of the standardized contracts, which use as their underlying commodity, the physical commodity of the fixing sets. But what about the OTC plaintiffs? We believe that the OTC plaintiff has – they sold the grade that the fixing sets. It's 99.95% pure. We believe that also given the relationship between the fixing and the physical market, that there is sufficiently direct injury to warrant the imposition of NHS liability for those individuals and to allow those victims to recover because the benchmark was intended to set the – be used broadly and widely. And to the extent that there are potential issues that could be raised about its broad-based adoption, that's not something – In Gailborn, when we're talking about the setting of the LIBOR, didn't we think that its wide adoption as a benchmark broke the chain of the court suggested? I believe that Gailborn had certainly brought up issues concerning proportionality and the fact that, yes, there could be people who adopted different potential benchmarks here, but I think we also need to – what I'd like to suggest – what I'd urge is that Gailborn, to some extent, needs to be limited on the unique nature of LIBOR, which – What makes LIBOR so unique and different than this kind of a case? So it's – What LIBOR is, it's so ubiquitous. It affects everything, basically, with an interest-bearing transaction. It takes anything – Hundreds of trillions of dollars' worth of assets are pegged to LIBOR or have an implicit reference to LIBOR. It's the time value of money, so it's going to have significant effects. But because people were incorporating LIBOR into transactions for car loans or home equity loans and so on, well beyond its original context, that just makes it different. Yeah, I believe that that is – But aren't people here also voluntarily incorporating it into contracts for Palladium Futures and for Palladium? I mean, that wasn't required either. It's not being voluntarily incorporated, again, because the standard – the contracts are set and standardized through the NYMEX. They're not being voluntarily incorporated, so the pricing terms of the futures contracts are basically taught – have a – are effectively have – Because they're tied to the physical market and the fixing sets, the prices in the physical market and specifically the particular grade, there's no room to negotiate, really, here. It's not as though you get to say that you don't get – You don't use the fixing – Would that not be true of car loans or other things that use the LIBOR as a benchmark? No, that would not be true for them because, again, they could set – a car loan interest rate could be set to anything. It could be set to a T-bill. It could be set to any particular interest that has no connection, potentially, to LIBOR. That's right, but if you're about to take a car loan, you don't have an opportunity to tell the dealer, I don't want to use the LIBOR rate. You don't have it. Go on. You're right. Yes, Your Honor, that is, in some respects, correct. There could be some contract adhesion here where it's you take my offer and that's what you're stuck with. Again, I think the proportionality concerns that may have animated the issues in LIBOR really should not be applied in a sweeping fashion to all financial products here, particularly in this case because we do have a finite asset. We have a commodity. And it wasn't appropriate to think in terms of proportionality concerns, right? Your view seems to be there's triple damages for a reason because it's punitive and it's not about proportionality to the harm. It's about compensating victims for wrongful conduct. So was it a mistake in Gelboim to think in terms of proportionality? I would, I think the court's concerns in Gelboim were, you know, I think were reasonable with respect to what LIBOR is and the scope and breadth of what LIBOR was. And so to the extent that, you know, because they understood that there are hundreds of trillions of dollars worth of transactions that are at issue here and that it could effectively bankrupt the world's, you know, 16 largest financial institutions or the number. So your distinction, the way you distinguish Gelboim is cash versus platinum. That's the difference? Yes, I believe that that is and I believe that that is a qualitative difference between the two and that the concerns about LIBOR, given what it is and how broad in scope it is, should not be extended, overextended in a way that might affect other assets or other commodities, particularly ones like this that are, you know, tangible in nature and really are limited to a finite number. Here there's a disproportionality concern because the defendants, I understand maybe you dispute this, but at least there's an argument that the defendants are only responsible for a small fraction of transactions and yet everybody who engaged in a transaction in one of these markets would be able to seek compensation from them and that seems disproportionate. But you're saying that we should think about proportionality concerns when it's entering other industries or other markets, but not when you might have liability for a whole market for defendants who are responsible only for a fraction of transactions within that market. Is that your argument that proportionality is relevant only in the first case, but not the second case? I think, yeah, I think that it should be, we do think that it should be cabined in a way to again make sure that the antitrust laws are not hamstrung and that antitrust policy and congressional intent in allowing private victim suits and the Supreme Court and this Court's holdings in prior cases acknowledging the purpose behind the antitrust laws doesn't get effectively, you know, isn't effectively undercut in a substantial way that, you know, you only have effectively a very small and finite number of individuals who could potentially bring a claim here. So is it your position in terms of the rule you're asking for, are you advocating that proportionality has no place in the analysis at all? I don't think proportionality, it should be used in a sparing sense and even if it is supposed to be used, again, you know, if the Court has were to decide that proportionality needs to be considered in all instances concerning financial markets on an efficient forester basis, we would suggest that here we've done, we've pleaded the sufficient facts to alleviate any proportionality concerns based on their control of the benchmark and their, what we believe is a non-de minimis amount of transaction volume within the exchange market. So we think that, that we've, you know, if we have to plead market control, we've done that and we've shown that based on their ability to control. Can I ask maybe before you run out of time just about the jurisdictional question? So our cases seem to say that the effects test applies when the forum state is the focal point or of the conduct of the nucleus of the harm. Was that the case here? Yeah, we believe that because again the NYMEX is a, is the largest and the preeminent exchange for platinum trading futures that they certainly had in mind and were engaging in trading during, before and during the fixing in aid of manipulating the fixing that there was a targeted effect to the U.S. commerce and I think that the contacts here and the actions here can be jurisdiction to option for this court adopted in Schwab. Does your success depend on a finding that conspiracy jurisdiction continues to exist? Not necessarily so. We would submit that we still have sufficient nexus here to satisfy either the Clayton Act basis for jurisdiction under the venue provision or even under the New York long arm. Sufficient nexus with each defendant or just some of the defendants? We certainly, there are two defendants obviously that have not raised personal jurisdiction here but with the two cross appellants we certainly have, believe that we have a sufficient domestic nexus here. What are their specific contact contacts other than the fact that you say they conspired with some defendants who did act within the jurisdiction and doesn't Supreme Court precedent make it clear that the defendants themselves have to have contacts with the proposed forum? We, yes, your honor, we believe though that we do have the contacts here relate to the trading and the trading that was done by their, by the affiliates or subsidiaries or even potentially even their own traders in the United States. So, we think that those, those acts create a sufficient domestic nexus and as you know, we need to show, we don't have to show even that there's a causal relationship between the contacts here in order to exercise personal jurisdiction as the Supreme Court recently held. They just have to be sufficiently related to the conduct and we submit that that, we certainly, Mr. Carr talked about it in terms of conspiracy jurisdiction but the allegations are that the defendants are communicating with affiliates in New York to get information that is that, would that be enough just to say that the defendants purposely avail themselves of the, of the forum states? We believe, yes, based on what they have done here that we could satisfy, you know, an effects test but, you know, only an effects test? I'm sorry, what only an effects test? What about just this allegation that they, they as part of conducting the fix, they were in close communication with the affiliates in New York and got information about what's happening in the New York market and they use that information to manipulate the fix? Is that, is that purposeful availment? I believe so. I believe that it would satisfy any, any of the prongs that are required under specific jurisdiction. We think it would satisfy and that the contacts here again, as I think the court in Fortness, you know, emphasizes that. But do you have any evidence of the actual communications between the defendants and the affiliates in New York, right? You just kind of assert that in your complaint and it's disputed. So, if that's the basis for jurisdiction, wouldn't we need more than a conclusory allegation that says that there was that communication? Well, if it's a dispute and, and I, and, you know, obviously the defendants do dispute the, the content or the nature of the communications or whether or not they actually provide a basis for the claim but, or relate to the claim. But we think that if there is a factual dispute, that's something for discovery. It's not to be... This is 12b-6. This is 12b-6. In any event, we're supposed to draw all inferences in favor of the, of you, the plaintiff. Correct, your honor. You're trying... Superimpose on all of that due process concerns and, and does it offend notions of fundamental fairness to take people who had no physical contact and such allegedly indirect contact with the forum and subject them to suit here? I would dispute the characterization that it's an indirect contact here but I, but I certainly believe that due process concerns are not offended here at all. We have the minimum contacts which is the first prong. We also, the second prong of substantial, satisfying traditional notions of substantial just, fair play and substantial justice is also sufficiently satisfied because these are not, you know, these aren't incidental companies with incidental contacts or effects on U.S. commerce. These are major companies that have, as they admitted even in the court below, that they are massive holders of platinum and palladium. So they're, they clearly have, it shouldn't offend due process particularly when they also claim that they have a 24-hour operations and global reach that they can be hailed into court here to be subjected and be subjected and answer the claims that are asserted against them. But a global reach has never been recognized as a contact with a forum sufficient to hail somebody into court, has it? No, we're not using the global reach as a basis for minimum contacts. It's being used as a basis for not offending the fact that they would have, that they shouldn't, it shouldn't be considered unreasonable to hail them into court here to defend their actions. So we don't think necessarily that the reach and their advertising that promotes this reach and their operations should be construed against us or construed in their favor as a way to have them avoid liability or jurisdiction here. May I ask a technical question, which is, you didn't name LPPFC and BASF Corp as defendants in your third amended complaint. Is there a reason for that? And so when we're thinking about jurisdiction over those parties, we should look to the allegations of the second amended complaint. Is that right? Well, just a slight tweak on what you said. BASF Corp, I think, is moving on to 12B6. The jurisdiction, I don't think they asserted personal jurisdiction as a claims, but it seems, but they're not named as defendants in the third amended complaint, right? Correct. They are not. So, so when we're evaluating those parties, we look to the allegations in the second amended complaint and whether if the district court was right, based on the allegations of the second amendment amended complaint, we would affirm its decision. Yes, you would evaluate the sufficiency of the claims as to those parties based on the Your time has long expired. However, we asked the questions. You have retained three minutes for rebuttal. We'll turn to the appellees in order. The first one is HSBC. Good morning, counsel. Good morning, Your Honor. Thank you. May it please the court. Paul Mazzina. I'm counsel for HSBC, but as we agreed, I'll cover the grounds for US is not claiming no contacts. That's correct. So, the grounds I'll be covering are that plaintiffs aren't efficient enforcers, that their CEA claims are extraterritorial, and that they haven't pleaded conspiracy or injury. So, to begin with the first of those, I think there are three features of this case that make clear that plaintiffs aren't efficient enforcers. First, they didn't deal directly with any defendant. Second, the prices at which they sold their investments were not Is that third fact that you've stated even a relevant consideration? The fact that there may be other more direct purchasers? Does that make them inefficient per se? Not per se, Your Honor, but it's certainly a relevant consideration under AGC, the second of the four AGC factors that this court has recited, including in Galboam, is the existence of more direct victims who could bring suit. So, I think that's a helpful point here, although it's, of course, not dispositive by itself. Right. Under the consensus that has developed among district judges since Galboam, as Judge Engelmeyer recently summarized in the aluminum case, just the first of the features I mentioned, the lack of direct dealing, that alone would be in a case alleging benchmark manipulation. Plaintiffs who didn't deal directly with the defendants are not efficient enforcers. And that's true even when those plaintiffs claim to have traded in instruments that expressly incorporated the benchmark, like live or denominated bonds. Here, there's no claim that any plaintiff transacted with any defendant. And this case is even easier than the cases involving instruments like live or denominated bonds. There's no privity test for antitrust standing, right? The Supreme Court said that. So, why does there need to be a direct relationship between the defendant and the plaintiff? Your Honor, it goes to the question of direct causation, which is the first factor. So, it's not about the relationship between the defendant and the plaintiff. It's about the relationship between the defendant's conduct and the plaintiff's harm, because it's about causation, right? So, if it's a case like this, where it's not about setting the price, it's about manipulation of the benchmark, doesn't the defendant's conduct in manipulating the benchmark directly cause the harm by plaintiffs who engaged in a transaction based on the benchmark? There's no intervening cause there, right? That's directness. I don't think so, Your Honor. What all of these courts have recognized is that when it's a third-party transaction, there's an independent decision that the defendant has no role in by the plaintiff and whatever third party it's dealing with to incorporate the benchmark in some way into their transaction, and that it would be unreasonable under AGC to hold the defendants responsible for all of those third-party transactions that they had no control in and most likely didn't even know were happening. But as I was saying, I think this case is even easier than those cases. But doesn't Eastman Kodak argue that when the defendant rigs a benchmark price incorporated into plaintiff's transactions, regardless of whether plaintiffs transact directly with defendants, plaintiffs suffer direct injury? No, Your Honor, I don't think Eastman Kodak speaks to this question at all, and certainly Judge Engelmeyer on remand didn't think so. He held in the opinion that we submitted with our 28-J letter, he concluded that Eastman Kodak hadn't addressed efficient enforcer, no party in that appeal had raised efficient enforcer, and on remand, he actually held that the plaintiffs in that case were not efficient enforcers. So in any event, though, you just answered Judge Menasche's question saying that your argument about them not being a direct purchaser deals with the causation point as well. How on a 12b-6 motion can a court resolve that question of causation? And shouldn't all the inferences be drawn in favor of the plaintiff at this stage so that notions of causation don't get resolved against the plaintiff? Your Honor, to be clear, it's not a question of factual causation. I mean, even going back to AGC, in AGC, the Supreme Court said the union in that case had intentionally caused by the defendant. It's a question of the legal significance of the facts alleged. Do they allege a sufficiently close connection for legal purposes to justify holding the defendants liable? And I think the key point that I... But the court does teach that it's akin to concepts of proximate causation, don't they? That's right, Your Honor. And proximate cause on undisputed facts, I think, is a legal question. And that's why courts have consistently resolved the efficient enforcer question on motions to dismiss. But here, what I think is... But isn't it a little odd to say if the allegation, if the conduct that's alleged is they were manipulating a benchmark that's used throughout the injury to say that we should think about causation in terms of who they transacted directly with. The point of the benchmark is not to govern their own transactions. It's to alter prices within the industry or the case where maybe firms colluded and fixed their own prices, then direct purchasers, certainly those are the ones who are directly impacted by the conduct. But in a benchmark manipulation case, it doesn't seem like that is the same... The people who are injured directly, say at the first step of the conduct, are not necessarily people who purchased directly from the direct purchasers. So, Your Honor, I think it would help for me to highlight what I mentioned is the second feature, which is what I think makes this easier than a typical benchmark manipulation case, which is that here, plaintiffs don't claim to have traded at prices that expressly incorporated the benchmark. So a lot of Your Honor's questions are really more relevant to cases like the LIBOR cases where plaintiffs actually traded in LIBOR-denominated bonds. Here, plaintiffs use rhetoric about a close correlation or a one-to-one relationship, but their own allegations show that that's not true. If it were, of course, the graph of OTC prices and NYMEX prices would be a straight line that just changed twice a day at the two fixings. But as Judge Woods recognized, plaintiffs' allegations make clear that spotted NYMEX prices fluctuated throughout the day in response to countless other economic variables. The complaint actually says that this case is about what they call... But there are dips in the price right after the fix, right? And so maybe the only people who are harmed are people who are selling right in those moments. But why wouldn't it be the case that they have a harm from the fix depressing prices in those moments before other transactions raise the price again? Of course, Your Honor, plaintiffs don't allege they did transact in those windows. And I hope to come to that later if I have the time on the injury point. And their own allegation... But that's not about antitrust standing. That would be about whether... No, that's right, Your Honor. But even as to someone... Well, let me caveat that. I think it is to the extent that antitrust standing, they have to actually allege that they have the injury that would give rise to antitrust standing. And if it really is... You're not disputing the injury component here, right? You're only arguing... We absolutely are, Your Honor. You are. Okay. Yes, what this court said in Harry v. Total, for example, is that plaintiffs have to allege facts that show that they traded during the period when the price was manipulated. Here, plaintiffs handpicked charts. They picked six specific days out of the class period to illustrate what they say is the price impact of the fix. Three of those six show a complete price recovery within 15 to 20 minutes. Elsewhere in the complaint, plaintiffs allege that the effects of the fix typically lasted only a few hours. And plaintiffs nowhere have alleged, and we frankly don't think they can allege, that they traded during that brief window when price was affected. Why couldn't they allege that they traded in that window? I think if they could, they would have, Your Honor. I think it's telling that they've only alleged the dates of the trades and not the timing of the trades. But so I think all of what we've been saying makes this case like 7 West 57th Street, which this court was able to dispose of in a summary order. The plaintiffs there allege that the defendants had suppressed LIBOR and that that affected plaintiffs' bond trades with third parties. The court said that plaintiffs clearly weren't efficient enforcers because their bonds were not expressly LIBOR denominated. Even though there were allegations that the price of the bonds plaintiffs traded was tied to LIBOR in a more general sense because market participants cared about LIBOR, they weren't expressly pegged to LIBOR. And the So we were just talking before about the idea because LIBOR is used in lots of different contexts. And so maybe there are special considerations around it. We also have cases like Sanner and Loeb about depressing the price in futures markets or commodities markets where the courts have said that there is a direct, there is directness, right? People who purchase soybeans futures and defendants have conspired to lower the price of soybeans futures. I mean, why isn't this case more like that? You know, I think those cases are distinguishable on a number of grounds. And I point, I think Judge Engelmeyer had a good discussion of Loeb in his opinion. First of all, they're not benchmark manipulation cases. They're cases about the plaintiffs alleged the defendants had manipulated a futures market, which affected a physical market. That's very different from a benchmark that no one in the market is constrained to use. People, you know, to go back to Judge Pooler's question earlier in the argument, everyone in the market understood what this number was, understood how it was set and what the process was. And no one was constrained to give that number any more weight in their transactions than they thought it merited. Is that true for people who purchased on NYMEX? Yes, Your Honor. There's no allegation that NYMEX traders were constrained to use this number in any way. Prices on NYMEX futures were set by the market. What I think counsel said in his argument is, well, NYMEX futures were tied to physical OTC platinum and palladium. But of course, physical platinum and palladium traders also weren't constrained to use this number. There's an allegation that some did, but notably not that the plaintiffs here did. But there's a one-to-one ratio between the prices set at the fixing and the prices in the physical and NYMEX markets. Isn't that a sufficiently direct relationship? Your Honor, I just don't think that's true on plaintiffs. And aren't we supposed to, at this stage of this case, to draw all inferences in favor of plaintiffs' allegations? Yes, Your Honor, but I don't think that's a permissible inference on the complaint. I think that's a rhetorical move by plaintiffs, but they have charts of these prices in their complaint that show the price fluctuating throughout the day, not just being in a one-to-one relationship. So I really don't think that. This idea about whether people were required to incorporate into their contracts, I mean, so a benchmark is never that way, required to be incorporated into the contracts, right? So are you basically saying that you can't ever really bring an antitrust claim for a benchmark manipulation because the benchmark is only a voluntary benchmark, and so it's just a difference in kind with fixing prices, and so therefore this kind of claim is never viable? Is that your I think plaintiffs who actually transacted with the defendants in transactions where the price was set by the benchmark are appropriate plaintiffs because there the defendants actually had a role in incorporating the benchmark into the transaction. Here you have transactions that are both with third parties. So even if the defendants knew that the benchmark was widely used throughout the industry or the market, there should only be liability when they themselves put the benchmark in the contract, in a contract that they are a party to. I think that's right, Your Honor. Does that mean that plaintiffs have to be contractual counterparties with the defendants in order to have antitrust standing? Is that what you're saying? At least in benchmark manipulation cases, that's what courts in the Southern District have uniformly, almost uniformly, held and pretty much uniformly over the last five years. By the way, it came off of this point that the test that's been adopted by Judge Wood here and by a number of other district court judges about proportionality, doesn't that also result in an outcome where very, very rarely, if ever, are you going to have plaintiffs who are effective enforcers if you apply this proportionality notion? I don't know why that would be true, Your Honor. I think the allegations in the complaint are the defendants engaged in a significant number of direct transactions that incorporated the benchmark price. So those plaintiffs would be efficient enforcers. And more generally, I think even going back to AGC, proportionality has always been at the heart of this inquiry. AGC says the consequences of an antitrust violation can ripple through the economy. And there is a point courts have to draw a line beyond which defendants should not be liable for those consequences. So proportionality is baked into that. And Your Honor, as I see that my time is up, we didn't get to extraterritoriality. I'm happy to answer any questions Your Honor has about that. Thank you, counsel. We'll hear from the next appellee, and that's the London and Palladium Fixing Corp. Mr. Katz. Good morning. Matthew Katz for London Platinum Palladium Fixing Company. May it please the court. Plaintiffs have not appealed dismissal of their conspiracy jurisdiction theory as to LPPFC. So unless you have any questions, we're happy to rest on our papers. I heard Judge Manasseh asking the appellant whether we should look to the Second Amendment complaint where you were included. Are you saying that's just not something we do? Oh, no. Apologies. No, that's correct. You should look at the Second Amendment complaint. The theories asserted by the plaintiffs' appellants on appeal concern their alter ego theory of jurisdiction. And that's what we'll rest on our papers on, unless you have any questions. But they have not asserted a conspiracy theory of jurisdiction as to LPPFC before this court. All right. Thank you. If there are no questions. I have a question. So, I mean, is your position that if there are four individuals who incorporate an entity for specifically conducting one activity, which here is the fix, and those four individuals have total control over the entity, the entity itself is not subject to jurisdiction based on a suit over that conduct? Doesn't that seem odd? Well, our position is that what the plaintiffs' appellants have argued is essentially control. And that is not sufficient to establish alter ego jurisdiction under any theory. So, they haven't alleged any of the factors that most of these courts consider to establish domination. So, there's no allegations that LPPFC failed to observe corporate formalities, no allegations that the member defendants intermingled funds with LPPFC, no allegations that LPPFC and the fix. And there might be, on some other grounds, jurisdiction over the member defendants for that conduct because they observed corporate formalities over LPPFC. It's just we treat it as a separate entity. That's your argument. There would need to be some kind of abuse of the corporate form. Correct. Correct. There's, you know, this court, all courts around the country have a long history of respecting corporate separateness here. And there's no basis here. There have been no allegations that that should be undermined. Thank you, counsel. I guess we have no further questions. Let me turn to BASF. Counsel, you may proceed. Good morning, BASF Corporation and BASF Metals Limited. And if I may, Your Honor, I'd like to reserve one minute of my time for rebuttal and cross appeal for BASF Metals. Okay. So, the bottom line here is that the district court correctly dismissed the plaintiff's claims against both BASF Corp and BASF Metals under Rule 12b-6. And in light of those determinations, the court need not address the personal jurisdiction issue related to BASF Metals. But in all events, BASF Metals is not subject to specific jurisdiction. And before turning to the jurisdictional issue, I'd just briefly like to address the 12b-6 issues involving BASF Corp. And, Judge Menachie, I think you hit it right on the head, is that it is critical to remember that BASF Corp is named as a defendant only in the Second Amendment complaint, which gave rise to the district court's first decision to look at the contact of the defendant itself, right? And the district court recognized... You have to credit her and give her the... I'm sorry, there's another attorney who's not on mute and is talking. So, if that person could put... Thank you. All right, go ahead. Thank you, Your Honor. So, as I was saying, it's critical to remember that BASF Corp is named as a defendant only in the Second Amendment complaint, which gave rise to the district court's first decision in 2017. That complaint addresses BASF Corp in only three paragraphs. And as the district court recognized in its 2017 decision, that complaint never alleged that BASF Corp engaged in any wrongdoing. And the plaintiff's only response here is that their allegations in that Second Amendment complaint showed that BASF Corp had the incentive and opportunity to participate in wrongdoing. But that is an argument about the mere possibility of misconduct. And that is the very argument that Twombly and McFaul rejected. So, if the plaintiffs cannot satisfy the Rule 8 pleading standard that applies to their Sherman F claim, they necessarily can't satisfy the Rule 9 pleading standard that applies to their CEA claims. And they never disputed in their to their CEA claims against BASF Corp. So, I want to turn now to the personal jurisdiction issue involving BASF Metals. And at the end of the day, I really do think this case comes down to a question of conspiracy jurisdiction. Because as the district court correctly found here, BASF Metals itself lacked minimum contacts with the United States. And I heard plaintiff's counsel say that offered two theories as to why BASF Metals itself purposely availed itself of the United States. The first was that it expressly aimed its conduct at the United States because it, quote, had in mind, unquote, that the auctions could impact NYMEX prices. But that is an argument about the mere foreseeability of harm in the United States. And this court has consistently and repeatedly rejected just that sort of mere foreseeability theory in cases like Schwab and Prime International and other cases. And the second theory that he offered was that BASF Metals engaged in constant communication with BASF Corp. And BASF Corp. is a U.S. entity. But that is a completely conclusory and vague allegation. And so, even though... If it were not conclusory, if in fact the defendants were engaged in constant communication with your client in the United States and there was that kind of interaction, would that be sufficient? No, I mean, I don't think it would. So, if the if the allegation is that engaged in communication with BASF Corp., I do think it's important to keep in mind that BASF Corp. and BASF Metals are two completely separate entities. And the plaintiff has not put forward any allegations that BASF Metals actually controlled the conduct of BASF Corp. And so, basically, all you would have, then, is that BASF Metals engaged in constant communication with BASF Corp. and then BASF Corp. independently. But if they're engaged in communication for FICS-related purposes or using information about the U.S. market to affect the FICS, would that be enough? I don't think it would. I mean, at the end of the day, all you have is the communication and then BASF Corp. The allegation here is that BASF Corp. independently did other things with that information. But I don't think you can then attribute what BASF Corp. did with that information to BASF Metals. I think you could only do that under a conspiracy... I see. Okay. Right. I get it. Under a conspiracy jurisdiction. So, if we have conspiracy liability, like if we have Pinkerton or other cases that say that if you're engaged in a conspiracy, you can attribute conduct to other conspirators, why would it violate due process to have a similar idea in the context of personal jurisdiction about attributing contacts to other conspirators? Well, Your Honor, I think the answer sort of lies in your question there. Because you said that conspiracy liability, why can't it be sort of mapped onto a jurisdictional question? But merits and jurisdiction are two completely separate issues. No, no. But the jurisdiction question is based on ideas of due process. And so, if we think it doesn't violate due process to hold a conspirator liable for another conspirator's conduct that we could attribute between conspirators, why would it offend due process to say you can be hauled into court based on the conduct of the conspirator? Because in the liability context, there is no requirement that one of the co-conspirators must have purposely availed himself of a particular form. So, there's really no question about the defendant's or co-conspirator's relationship with the forum in the liability context. All you're doing in the liability context is examining the relationship between the plaintiff and the defendant, and then the defendant and other defendants. But in the jurisdictional context, you're looking at the relationship between the defendant, the forum, and the litigation. And so, you have this emphasis on the forum in the jurisdictional context. And the Supreme Court has made consistently has consistently said that you must purposely avail yourself of a forum for jurisdictional purposes. And you just don't have that same sort of requirement in the liability context. You can be held liable for the acts of an alleged co-conspirator, even if you don't know all the co-conspirators, even if you're not aware of what the other co-conspirators are doing. You know, you're allowed to attribute all of the conduct of all these alleged co-conspirators, regardless of whether a particular co-conspirator, you know, purposely sought to go... Right, and we've said that doesn't violate due process. I'm just saying it seems odd that we think that you can attribute all that liability between co-conspirators, and yet attributing context. But I get your point that it's just a different inquiry. Right. Yeah, I do think that at the end of the day, one issue that the plaintiffs are raising about conspiracy liability, it's really just a merits question. And jurisdiction is separate from the merits. So I don't think you can merge the two because in the... No, I understand. But you get my point, which is, if we don't think it offends due process to impose liability, to attribute liability between co-conspirators, it's a little odd to say it offends due process to attribute context between co-conspirators. But I understand your answer. Okay. Thank you, counsel. Your time has expired. You have reserved one minute on the cross-appeal. So I'll let you hold that. We'll turn to ICBS. Good morning. Good morning. Robert Houck for ICBC Standard Bank, PLC. May it please the court. We agree with the points made by Mr. Mazzina and Mr. Lawrence, and we'd like to sort of take up where we think that the district court maybe didn't get it right in terms of the Schwab factors, and particularly the third Schwab factor. And we think that in particular, the allegations within the complaint don't satisfy what Schwab requires. And so we want to sort of address those issues. So the first is that you have plausible suit-related form contacts within the meeting of Walden and Waldman by a plausible co-conspirator that furthered the conspiracy. And here, Judge Woods has found, and the complaint, I think, makes clear that the suit-related conduct is the manipulation of the auctions in London. And the district court found that twice in both Platinum One and Platinum Two. And we have the sworn declaration of the head of litigation of the bank saying that it had no branch office or permanent employees here. Employees only participated in auctions in London. And in fact, there wasn't an affiliate in the US until the last few months of the class period. And so Judge Woods, we think, got it correct in rejecting all theories of specific jurisdiction over Standard Bank, including jurisdiction in Platinum One, because it says nowhere in this Second Amendment complaint, the plaintiff's alleged that any defendant, foreign or domestic, engaged in any activity related to the process or the fixing calls while present in the forum. The change... You don't have to be present in the forum. And why can't the actions of some of the defendants who were present and acting in the forum be imputed to your client? Well, okay. So there are two different things there. So first of all, if you're talking about an effects test where you have non-US conduct, there is nothing that says that the conduct was expressly aimed at the United States. And as counsel for HSBC, excuse me, for BASF just made the point that that's just a foreseeability standard. And the court rejected that in Schwab with the California market, which is a very, very large market as well. But the plaintiffs made clear that it's a global market for Platinum and Palladium, and their Third Amendment complaint is replete with allegations about the global nature of the market. They talk about the 24-hour nature of it. It's global. And so it's not the case that it's... So just because a defendant aims its conduct at lots of different forums, because it's a global market, there would never be jurisdiction under the effect test? That is what the court held in Schwab. And if it is expressly aimed at the United States, where it is the entire focus of the conspiracy, that is the holding. That's correct. Can it be argued that with respect to the NYMEX transactions, it was aimed at the US? Not on what claimants have pled. I mean, plaintiffs have only said that there was a conspiracy within London to fix a benchmark that is used globally. They talk about the London fixing participants could change the price or affect the price, but regardless of what the true aggregate demands were, that had been funneled to them, that were on their order books, close quote. And so they themselves say that the London fixing group has total discretion to do what they want. And so that's part of the reason. What about the allegation that the London fixing group is in communication with affiliates in New York to get information about the state of the information in order to manipulate the fix? So if you're getting up-to-date market information from New York in order to engage in the conduct in London, why isn't that purposeful availment of the New York market that would be sufficient for jurisdiction? I think that, first of all, the allegations themselves don't state that. The allegations just say there's constant communication. It doesn't say it's for the purpose of updating the fix and for the purpose of feeding in order information in order to maximize... Okay, maybe. So just for the purposes of my hypothetical, then, let's say that it was. So let's say that they were getting in constant communication for the purpose of manipulating the fix. Would that be purposeful availment? No, I think you'd still have to show purposeful availment of that. Well, that's what I'm saying. So they're engaging in the fix in London. And the way they do that is they reach out to the New York market to find people who trade in platinum and palladium to get lots of information about the market conditions. And they use that information in order to engage in the allegedly unlawful conduct in London. So they've reached into the New York market to get information that helps them accomplish the conduct that's alleged to be unlawful. So why isn't that sufficient? Well, I mean, I would say still that there isn't sufficient contact. And I don't think that that would... In this case, we have normal course communications that have nothing close to that. And so it depends on whether they were normal course communications or they were communications that were for the purpose of manipulating the fix. I understand you're saying that they don't allege sufficiently that they really were getting information to be used to manipulate the fix. But I'm saying if that was the purpose of the communications, then that would be enough. And then you said, well, they just don't have those allegations. So if it were true that they were in contact with information for the purpose of manipulating the fix, that would be a bailment of the New York market. I think the position we take is that the fix is determined in London by the conspiracy within London. And Waldman would say that that's not enough contact with the U.S. market if all of the decision making is occurring within London in that conspiracy. Okay. Thank you, Your Honor. I just would like to turn quickly to the efficient enforcer argument that my colleagues at the HSBC, who represent HSBC, he made, I think, a fairly important concession here about what this ultimately comes down to and what their position would be. It's that unless you dealt directly in the physical commodity that was tied to the narrow band of transactions and individuals, everybody else is out of luck and cannot see one of the antitrust laws. It would deprive victims in the exchange market in totality of their right to seek redress under the antitrust laws. And we submit that that would be an unduly harsh outcome here, particularly given that the antitrust laws were meant to protect those that all victims of antitrust, anti-competitive harm here, particularly where there's a direct relationship. And effectively, by creating a situation where privity becomes effectively the de facto benchmark by which you have to measure your efficient enforcer status, efficient enforcer status kind of falls as dead letter law because you don't have to deal with any of these other issues about proximate causation because privity effectively would ultimately answer all questions. And they're presumptively going to be the ones with the proper platists to bring this to claim, but that's why we have this. So what about the argument that, you know, you set a benchmark and lots of people in the market might adopt it voluntarily, but really the people who are directly harmed by the defendant's conduct are the people who transact with them where they themselves, the manipulators, incorporated into their contract. Why aren't those people more directly harmed than the other people you're harming? They're both harmed and you can have, and I think the Supreme Court recognizes very recently in the Appleby Pepper case, that you can have multiple classes of victims with direct injury. So that there may be multiple classes of victims with injury here doesn't end the inquiry and otherwise deprive the plaintiffs here of their ability to have standing and to sue under the antitrust laws. But do you agree with this characterization that actually the defendants set a benchmark but, you know, they just sent that out into the world and people decided what to do with it and really the only thing they did directly to anybody was when they incorporated it into their own contracts? No, we would dispute that. You know, it seems to me, it would seem implausible to say that they had no understanding of what it is they were doing, that this benchmark was basically for their own private use, for their own private sets of transactions and nothing else. In order to be on these benchmark committees and to be even within the greater London bullion market, you have to, or these other trade associations, they have to be large dealers. They have to be large-scale dealers so they know what their effect is and they have, so we would submit that they don't do this unconscious of what they're doing and I think that that can't be, even if that was, they want to argue that that's not something that should be resolved on a 12b6 motion and again, you know, just to drive the point home, what they're asking for is basically a get out of court free card. They want to say that unless you're in this very narrow band of individuals with the narrow band of transactions, everybody loses and everybody, no one else could bring antitrust law and that would be an outcome. That's not what they say and that's not what Judge Wood said. Judge Wood said you look at proportionality and if the proportionality is too small, then you're not an efficient enforcer. Yes, he did say that. Right. I'm sorry. Yeah, I agree that that's what the court held but I think they, he took, he overemphasized the proportionality concern here given how the markets operate and given the direct relationship between the fixing and the effect on the NYMEX futures market and so we should be, it should certainly, you know, while again, as I said earlier, proportionality may have its consideration and its place in certain types of markets. Here, it really doesn't arise in the same way and if I just can very briefly turn to just the extraterritoriality and the personal jurisdiction, you know, I think it'd be summarized fairly quickly, you know, the domestic acts that we've alleged here, the NYMEX trading, the communications from U.S. traders, the participants of Lund and the fixing were part and parcel of a defendant's overall scheme. Defendants want to atomize the scheme and say it's only London and it's only this fixed but it's not. That's not how we plead this. We plead a conspiracy to fix prices in the markets. The fixing was the vehicle to do that and we shouldn't. Yes, but the question is not are there any domestic contacts. The question is do they predominate or does, do foreign transactions predominate, right? We believe that the contacts here and the actions in the United States are sufficient, create a sufficient domestic nexus for the actions here. They were engaging in trading here in the United States and that trading was both used and communicating. The focus of the commodities, we're supposed to look at the focus of the statute, right? The focus of the Commodities Exchange Act is what? The transactions, right? Yes, and the transactions occur in the U.S. Is that your argument? Well, we both look at both the conduct and the transactions, which I believe this is what the court said in prime. And again, our case is markedly different from prime given the degree of attenuation and the almost exclusive extraterritorial nature in which the conduct was. They weren't alleging any conduct in the United States. The only thing that they had was effectively a ripple effect after multiple steps in the causal chain that ultimately resulted in some. I think I understand that that's in your brief. Can I just ask you to address two pleading issues that came up with opposing counsel? So one is this idea that there's really a price effect from the fix right after the fix occurs. There's a dip in the price and then ongoing trading raises the price again. And so you haven't alleged that you purchased or that you sold a platinum and palladium in those windows where the fix affected the price. And the other pleading issue is this idea that you only allege ongoing for jurisdiction, you only allege ongoing communications with U.S. affiliates, but don't allege that the communications were for the purpose of manipulating the fix. So to address the injury point, they're demanding a level of specificity that I that you don't manipulate because the plaintiff's transacted in the market on the days where there was manipulation. I don't think you can determine as a matter of law that the price effects that were occurring during and after the manipulation didn't also have, even if they transacted after, it didn't have lasting effects because once you suppress the I think that as a causal matter, that can't be decided on a rule 12B6. And then secondly, turning to the communications for personal jurisdiction, you know, the communications, we think it's a fair inference based on what we've alleged about the way the fixing operates and what they were providing to the fixing defendants in aid of their overall conspiracy are sufficient. But even if that in and of itself wasn't sufficient, we are also alleging non-mixed trading in the U.S. that was occurring before and during the fixing itself. So the two combined have the overall effect to create sufficient domestic contacts for purposes of extending jurisdiction. So counsel, one of the natures of a conspiracy that we find in the criminal law is it's secret. But this is a conspiracy in plain sight that you're alleging, isn't that correct? It is a, the existence of the fixing itself is public, but the operations and what's going on in it is secret. That is not open to the world. So London, for example, LIBOR is in a similar, you know, if you want to just use the example of other benchmarking cases, their existence as a feature is nonetheless is public. And I'll actually use the FX case, which is actually more direct in that sense, because there you have a WM Reuters rate benchmark that's occurring in overseas, even at 4 p.m. And that opens in plain sight. But what's going on during that and what ultimately affects the price is certainly not known to the public. And it's why there are now indictments and criminal guilty pleas for some of these major banks for that. So that it was operating, the existence of the thing was operating in plain sight, doesn't necessarily mean that the conduct within that operation was known to everyone. Thank you, counsel. I will turn for one minute to Mr. Lawrence, only on the cross appeal. Thank you, your honors. I just want to make two brief points in response to the jurisdictional arguments at the end there. So plaintiff's counsel, again, came back to the constant allegation and then asked the court to essentially infer that this is sufficient and that there was more going on than just constant communication. But again, this is exactly the sort of naked assertion that is devoid of further factual enhancement that Iqbal talks about. So I don't think it's sufficient to just allege constant communication and then say that jurisdiction is established. The other point that plaintiff's counsel raised is trading that it's ambiguous as to what the communication was about and that might make a difference. Would it be appropriate to do some kind of limited jurisdictional discovery? Is that something that would be a solution to that problem? I don't think so, your honors. I mean, this is the plaintiff's burden to establish jurisdiction. They have to put forward actual facts and allegations that would make a prima facie showing in jurisdiction, and they haven't done so here. So I don't think a plaintiff can just come in and say there was constant communication. We don't really know what that communication was about, but we think we should be entitled to jurisdictional discovery. I don't think that would be allowed even in the domestic context, but this involves a foreign defendant. And I think this court in cases like Jazzini has been pretty clear that we don't just, the court doesn't just grant automatic jurisdictional discovery overseas based on threat bearer allegations. And I think that's exactly what you have here. But the second point that I want to raise is plaintiff's counsel mentioned US trading on the NYMEX, but that trading with, when it comes to the BASF entities, plaintiffs allege that BASF engaged in that trading and you cannot impute that conduct to BASF metals unless you're invoking a conspiracy jurisdiction theory. But that theory is unconstitutional because BASF metals itself is not engaging in it, and so it can't be imputed to it. So unless the court has any further questions. Thank you, counsel. Thank you, counsel. Let me thank all counsel for a well-argued case. We will reserve decision.